UNITED STATES, Appellee

v.

Bobby L. KNOX, Sergeant, U.S. Air Force, Appellant.

No. 93–0341.
CMR No. 28628.

U.S. Court of Military Appeals.

Submitted Feb. 23, 1994.

Decided Sept. 29, 1994.

Certiorari Denied Feb. 21, 1995.

See 115 S.Ct. 1106.

For Appellant: *Colonel Jay L. Cohen* and *Captain Robert A. Parks* (on brief); *Colonel Terry J. Woodhouse.*

For Appellee: *Colonel Jeffery T. Infelise* and *Major Barnard N. Madsen* (on brief).

PER CURIAM:

Contrary to his pleas, appellant was convicted, by a general court-martial composed of officer and enlisted members, of rape and conspiracy to commit rape, in violation of Articles 120 and 81, Uniform Code of Military Justice, 10 USC §§ 920 and 881, respectively. He was sentenced to a dishonorable discharge, hard labor without confinement for 90 days, and reduction to the lowest enlisted pay grade. The convening authority approved the sentence, and the Court of Military Review affirmed. This Court granted review of whether the military judge erred in refusing to allow appellant to testify about the victim's prior sexual acts and her promiscuity to support his claim that she consented to sexual intercourse or to support his defense of mistake-of-fact as to her consent.

Based upon our review of the record and the briefs of the parties, we conclude that the military judge properly excluded the proffered evidence.

The facts as stated by the Court of Military Review are quoted verbatim as follows:

The appellant, the prosecutrix, Theresa, and Sergeant "Lu" Castonguay worked in the same shop at Kadena Air Base, Japan. Theresa and Castonguay were intimately involved and engaged in sexual relations on a regular basis. The appellant and Castonguay were close friends and confidants.

On 28 April 1989, a Friday, the appellant was scheduled to go TDY to the Philippines. That same date members of his shop gathered outside Theresa's dormitory to celebrate the end of the week and a favorable dorm inspection. After drinking three or so beers, Theresa went to her room for a shower. This occurred about 1900. After her shower, the appellant invited her and Castonguay to his room. While she was there and sitting on ... Castonguay's lap, the appellant kept running his hands up and down her

legs. She told him to "knock it off." By then she was sipping on her sixth beer.

Co-workers of the appellant testified that he was in the habit of making crude, sexually explicit remarks to Theresa. The appellant either denied making the remarks or contended they were said in jest. Castonguay was also heard to say that since he was not "[sexually] satisfying Theresa, he was going to get [the appellant] to f[___] her."

About 2245 or so, the appellant left the room, and "Lu" joked about locking him out of his room. Later, when the appellant returned, "Lu" picked Theresa up and carried her to the bed. He took off his clothes and began "rolling around ... hugging and kissing" Theresa, who was still dressed. When Theresa looked up and saw the appellant standing by the bed, she jumped up and left for the bathroom. Apparently, the appellant was concerned about where he was going to stay for the night since his bed appeared to be occupied. Theresa said he could stay in her room. This appeared to satisfy the appellant because he left. Theresa sat on the bed, undressed, rolled over next to Castonguay and began "hugging and kissing" him. She then rolled on her back and Castonguay rolled on top of her. That's the last thing she remembered as she fell asleep. She does not remember having sex with Castonguay that evening, and she thinks she would have remembered if she had.

When she awoke, she was on her stomach, and someone was having sexual intercourse with her. There was a comforter over her head, and "some hands were on [her] back." In the process of waking up, she assumed her partner was Castonguay and responded for "5 or 10 seconds." Later, she thought "there was something funny going on," and looked over her shoulder and saw the appellant "having sex with [her]." She started crying and said, "Lu, get him the hell out of here." The appellant withdrew from her and jumped off the bed. As he jumped off, he said, "Lu, we f[ ___]ed up" and "Lu, we're in trouble," and "Lu, I didn't know that she didn't know." She heard Castonguay say, "It's okay, Bobby, she'll be okay in a minute." She screamed for both of them to

leave the room so she could get dressed which they did. Later, the appellant approached Theresa and said, "we're really sorry; we're really sorry and we feel so bad about this; we discussed it and we're ready to face the consequences for what we did." She subsequently called the Rape Intervention Crisis Center at the Kadena Clinic. She said she did not consent to having sexual intercourse with the appellant.

Theresa's and the appellant's testimony are essentially in agreement as to what happened up to the point where the appellant left to stay in her room so she and Castonguay could continue their romantic interlude. It is here that the two versions of the event part company. The appellant testified that when he returned to his room a second time, Theresa and Castonguay were naked and he was performing cunnilingus on her. [Appellant] stated he laid down on the other end of the bed and went to sleep. When he awoke sometime later, Theresa was on all fours at the end of the bed performing fellatio on Castonguay. Theresa looked at him and he interpreted her "suggestive looks and motions" as an invitation to join the sexual encounter. He did so and had sexual intercourse with her for "5 to 7" minutes, achieving a climax. When he withdrew from her midway in the session, she encouraged him to continue. He said that while Theresa made no noise during the episode, she was awake and not asleep.

Shortly thereafter, the appellant told the court that Theresa became upset and told Castonguay "[t]o get [the appellant] the hell out of there." The appellant indicated that this behavior was not unusual for Theresa as she would occasionally go "spastic like" and start "cussing" at other people. He denied saying, "Lu, we f[___]ed up," "Lu, we're in trouble," and "Lu, I didn't know that she didn't know." He also denied saying, "We're ready to turn ourselves in and face the consequences." He admitted that he and Castonguay had spoken with Theresa in an attempt to find out "what her problem was[.]" It was during this conversation that he said Theresa remarked, "I bet you've done this with other girls." The appellant maintained that There-

sa consented to the sexual encounter and that he and Castonguay had no agreement to engage her in sexual relations.

The defense offered expert testimony that certain sleep disorders could make it possible for Theresa to have awakened and consented to sexual intercourse and not remember it. It was also possible for the appellant, who had just awakened, to have sexual relations and not remember all of what had taken place. However, the existence of a sleep disorder does not explain the two diametrically opposed versions of what happened.

Additionally, the defense tendered expert testimony that the alleged victim did not have a post-traumatic stress disorder as the result of the events taking place on 28–29 April 1989. The defense also offered evidence of Theresa's reputation for not telling the truth, and the appellant's reputation for truthfulness.

In rebuttal, the government established that the next morning, Theresa, upset and crying, told a male friend what had happened. She told him she passed out in the appellant's room with Castonguay and when she awoke the appellant was on top of her. She said that when she became awake, he got off and started apologizing. Finally, the government offered expert testimony that Theresa did exhibit symptoms of a post-traumatic stress disorder.

\* \* \*

At trial the appellant served notice under Mil.R.Evid. 412(c)(1) that he intended to "offer evidence of specific incident and reputation evidence of the [prosecutrix's] past sexual behavior." The appellant claims "he thought [the prosecutrix] was awake and by her actions was consenting to his advances." Thus, evidence as to his *state of mind* was constitutionally required.

In his offer of proof under Mil.R.Evid. 412(c)(2), the appellant stated he would testify that the prosecutrix had the reputation of being a "bimbo" who liked to "party," was sexually promiscuous, and "very easy;" he had also been told that she had taken "her top off" in a downtown bar; several co-workers had stated to him that they had contacted

[sic] a sexually transmitted disease from her in the fall of 1988; and that in July 1988, at a beach party, she engaged in various sex acts in the presence of others—the appellant was not at the party, but was told about the incident. Unpub. op. at 1–4, 6 (AFCMR April 20, 1992).

Mil.R.Evid. 412(a), Manual for Courts-Martial, United States, 1984, prohibits admission "in a case in which a person is accused of a nonconsensual sexual offense, [of] reputation or opinion evidence of the past sexual behavior of an alleged victim of such nonconsensual sexual offense...." Mil.R.Evid. 412(b)(1) prohibits admission "in a case in which a person is accused of a nonconsensual sexual offense, [of] evidence of a victim's past sexual behavior other than reputation or opinion evidence ..." unless such evidence is "constitutionally required to be admitted." We have recognized that admission of such evidence is constitutionally required if it is relevant. *United States v. Greaves,* 40. MJ 432 (CMA 1994).

On appeal, appellant contends the military judge erred in excluding evidence of Theresa's promiscuous nature. He contends such evidence was both relevant and material to the issue of Theresa's consent and appellant's reasonable belief the prosecutrix was consenting. We disagree for two reasons. First and foremost, appellant's defense at trial did not turn upon whether appellant honestly and reasonably believed that the victim was consenting to his sexual acts, but rather he testified that he was invited to join an ongoing sexual event. To the extent that the victim's reputation made it more or less likely that she would participate in such a threesome is exactly the kind of evidence that Mil.R.Evid. 412 proscribes.

Secondly, appellant was allowed to present evidence of his own experiences with Theresa. In particular, he was permitted to testify about the sexual banter he and Theresa engaged in, as well as one occasion when he and Theresa watched an adult movie together.

Appellant was not denied the opportunity: (1) to testify that the prosecutrix motioned for him to join in her sexual encounter with "Lu"; or (2) to present [a] defense that he reasonably and honestly thought she had consented to have sex with him.

The issues in controversy in this case are whether the sexual adventure took place as described by appellant or as described by the victim; whether she was asleep or awake; whether she invited appellant into the situation; or whether he raped her while she slept. Appellant was not denied the opportunity to fully present his defense. We agree with the military judge's ruling that such evidence was not relevant, material, or favorable to the defense. *United States v. Greaves, supra.*

The decision of the United States Air Force Court of Military Review is affirmed.